## THE VESPER.

*(District Court, S. D. New York.   December, 1881.)*

1. COLLISION—SPEED OF SAILING-VESSEL—LOOKOUT—OBSCURATION OF LIGHTS—THIRD AND EIGHTH RULES OF NAVIGATION.

Where the steam-propeller V. collided with the schooner J. J., in the evening of October 7, between Bedloe's island and Robbins' reef, in New York harbor, striking her on the port bow, and the J. J. had been sailing at the rate of eight knots an hour, with a strong flood tide, on a N. E. course, with the wind nearly free, until just before the collision, when she for the first time saw the V., and then ported to avoid the collision, but had not seen her lights, nor those of another steamer near the V., both being long in sight,—

*Held*, that the failure of the J. J. to see the other lights was due to her not keeping a proper lookout.

*And further held,* that had there been, as claimed, a fog so dense as to obscure the V.'s lights, it would have been, under the circumstances, carelessness in the J. J. to sail at such speed where she was likely to meet other vessels; that the momentary appearance and disappearance of the red light of the J. J. several times in succession, as seen from the V. before the collision, the green light being constantly in view, was not caused by the fluctuations in the J. J.'s jib shutting out the red light, but to unsteadiness in her navigation.

*And further held,* that had the J. J. been approaching head on, as claimed, and had the red light been continuously hidden by the jib, as claimed, except the momentary fluctuations just before the collision, the V. could not be charged with fault in not avoiding the J. J., and it would have been the fault or misfortune of the J. J. in not complying with rules 3 and 8, Rev. St. § 4233, regulating the lights on vessels, (*Hoben* v. *Westover,* 2 FED. REP. 91, distinguished;) that the V. was not in fault, but the collision was wholly due to the J. J. changing her course in the confusion occasioned by her failure sooner to see the other's lights, and by her careless navigation.

In Admiralty.

*Alexander & Ash,* for libellants.

*Owen & Gray,* for claimants.

BROWN, D. J. This libel was filed to recover damages received by the schooner John Jay, on the evening of October 7, 1878, in a collision with the steam-propeller Vesper, in the upper bay, at a point about half way between Bedloe's island and Robbins' Reef light.

The schooner was of 39 3-5 tons register, bound from Tottenville to the North river, New York, without cargo, and after leaving the kilns was heading for the battery lights, upon a course about north-east. There was a strong south-east wind, and the tide was flood, under which the schooner was making about eight knots per hour. She had on board a captain, mate, and deck hand, and, according to their testimony, she was sailing about three points free, and kept her course unchanged after leaving the kilns, heading for the battery lights, until she was passing the edge of the flats between Bedloe's island and Robbins' Reef light, and was about entering the deeper water of the ship channel when her captain, who was at the helm, saw for the first time the steamer Vesper, as he says, not over half her length (about 25 yards) distant, coming head on directly upon him, and a little over his port bow. He testifies that he immediately ported his helm to avoid being split open, and that his vessel had only time to swing some two or three points to starboard when she was struck by the Vesper's bows between her main chains on the port side, cutting her to within about two inches of the water's edge, breaking two of her deck plank, and making a hole about four feet long by two feet deep. The Vesper is a steam-propeller, 150 feet long, of 331 tons register, drawing, loaded, seven and one-half feet of water, and plying regularly between New York and Wilmington, Delaware, by way of the Delaware and Raritan canal. She left pier 13, East river, New York, on the seventh of October, upon one of her usual trips, at about 7 o'clock in the evening, with all her proper lights burning brightly. After clearing Governor's island, going less than a half mile to the westward of it, she pursued her usual course in the ship channel down the bay, upon a south-west course, keeping Robbins' Reef light about one

point to starboard. Her captain was alone in the wheel-house, until shortly before the collision, when the mate came to his assistance. They testify that the night was a cloudy, moonlight night; that when off Bedloe's island the John Jay was first seen showing her red light about one point, or thereabouts, off the Vesper's starboard bow, estimated to be about a mile distant; that after a little while her red light was shut in and her green light appeared, when she was judged to be 400 or 500 yards distant, whereupon the wheel of the Vesper was put to starboard to keep off; that after sailing from one to two minutes with only her green light visible, and being then about two points off the Vesper's starboard bow, her red light appeared momentarily, and then disappeared three times in succession, at very short intervals, all occurring within some few seconds, the green light being all the time in view; that immediately upon this reappearance of the red light two whistles were blown, and the wheel put more to starboard; that the John Jay thereupon ported her helm, luffed up and showed her red light, shut in her green light, and ran directly caross the bows of the Vesper; that the John Jay, when she ported, was some 200 yards distant and some 50 yards to westward, (as I interpret the testimony,) and when the Vesper, still standing off from her, would have cleared her by some 50 to 100 yards, if her course had not been changed; that her porting occurred within five seconds of the reappearance of the red light, and that the captain of the Vesper immediately rang four bells to slow, stop, and reverse, which were immediately obeyed, and that she was nearly stopped when the collision occurred; that the porting of the helm was from one minute to a minute and a half before the collision, and that the Vesper could then do nothing more to avoid the John Jay, and that the collision was owing solely to the latter's change of course.

The engineer of the Vesper testifies that he felt the touch of the collision; that he then had the engine backing for about a minute at least, 65 revolutions backward; and that as she was going that night the Vesper's headway would be stopped in a minute and a half. The cook of the John Jay also confirms the statement that the Vesper was nearly stopped.

At the time of the collision the steam-propeller Mayflower, with a barge in tow, was some 400 or 500 yards astern of the Vesper, and about 100 yards to the eastward. The Vesper had passed her about 50 yards to the westward, a little below Bedloe's island, some 10 minutes before the collision, and they were proceeding in nearly parallel courses. The captain of the Mayflower testified that he saw the red light of the John Jay when off Bedloe's island; saw her afterwards shut in her red and show her green light; that being a little further to the eastward he did not see the momentary appearance and disappearance of the red light afterwards, as testified by the captain of the Vesper; that after the red light was shut in, her green light alone showed continuously until shortly before the collision, when he saw the John Jay port and shut in her green light and show her red light solid; that at the time the John Jay ported he could see the opening between her and the Vesper; that she was inside of the Vesper's course and nearly 100 yards to the west of her, and that she would have gone 50 to 100 yards clear of the Vesper if she had not ported; that he heard the bells of the Vesper to stop and back, and that her lights were all the time burning brightly.

The deck hand of the John Jay (colored) states that he was forward, on the lookout; that he first saw the low light of the Vesper about 100 yards off, and that he stepped to windward and asked the captain if he saw the light ahead, saying, "You are steering directly for it;" that he got no answer, but did not then think there was any danger of a collision; that he saw no colored lights of the Vesper, or of any other vessel. The cook, who says he was on the deck of the John Jay, testifies that he saw no lights of the Vesper, or of any other vessel, and the captain says the same. The cook says he saw the Vesper's bow 200 yards off; that the captain saw her first, and immediately ported. The captain says he first saw the Vesper when only half his length off, (25 yards,) and that he saw her because he happened to stoop down, as is his wont, and look under the boom.

The libellant seeks to explain this failure of all aboard the John Jay to see the lights, either of the Vesper or of the Mayflower, by claiming that a low fog hung over the water, which obscured the vision of persons so low down as those on the deck of the John Jay, while the vision of those upon the steamer's decks was not so obstructed. The testimony does not sustain this argument. The deck hand of the John Jay, as well as the witnesses from the other vessels, testify that there was no fog. Had there been any such fog as to prevent the lights being seen within a short distance, it would have been gross carelessness in the John Jay to have been sailing at the rate of eight knots an hour where other vessels were liable to be encountered. But the evidence is that there was no fog or obscuration of the lights. The lights of the John Jay were seen from the Vesper and the Mayflower at least a mile away, and they testify that lights of vessels could easily be seen that distance; and the gas-lights of the battery are alleged by the cook of the John Jay to to have been visible after leaving the kilns, which is at least five miles off.

I am forced to the conclusion, from the whole testimony, that the John Jay not only had no proper lookout, but that the captain, who was at the wheel, was also grossly negligent in not observing what vessels were near his course, and careless in navigating his vessel. He was sailing, as he says, at the rate of eight knots an hour, and the tide was with him. He had been coming across the flats from the mouth of the kilns, where only a few light-draught vessels pass, and where he might naturally be less observant. He arrived in the deeper water of the channel, doubtless, much sooner than he was aware of, and he had also gone far more to the eastward than he supposed. He testifies positively that, from the time of leaving the kilns, he steered straight for the battery lights. Had he done so this collision could not have happened. That course would have put him, when half way between Bedloe's island and Robbins' Reef light, still upon the flats, and nearly a quarter of a mile to the west of their easterly edge. He testifies, however, that "at the time of the collision we had just got off the edge of the flats," while the actual place of collision, as shown from the course of the Vesper, viz., S. W., after clear-

ing Governor's island, keeping Robbins' Reef light one point to starboard, must have been fully a quarter of a mile to the east of the edge of the flats, or a half mile to the windward of the course which the captain says he took and kept after leaving the kilns. As the mouth of the kilns is but two miles distant from the place of collision, a deviation of half a mile to windward in so short a distance could only arise from very careless navigation, as well as careless observation.

If, from the time of leaving the kilns up to the time of porting, just before the collision, the John Jay kept a steady course unchanged, as her witnesses testify, then the change from her red light to her green light, some considerable time before the collision, which the witnesses from the Vesper and the Mayflower all assert, would show that the Vesper had already passed the point of intersection of the courses of the two vessels, as there is no claim that the Vesper had, before that time, changed her course, and there was no occasion for her doing so.

The claim that the John Jay was all the while really heading for the Vesper, but that her red light, after a time, became permanently hidden behind her jib, except as it momentarily appeared and disappeared three times from the fluctuations of the jib, is not consistent with all the facts, and would not, in my judgment, even if true, entitle the libellant to recover. Had the John Jay's course been steady, and the red light been first obscured by the jib only as the Vesper was passing to windward of her, the momentary appearance and disappearance of the red light, arising from the fluctuations of the jib, would have occured at or near the time when the red light first disappeared; whereas, they did not occur then, but some considerable time afterwards. They should have been seen also from the Mayflower, which was not the case; the change there seen was from red to green, clear and solid and continuous, until the John Jay ported.

It is much more likely that the reappearance of the red light arose from unsteady navigation, of which the place of collision affords strong evidence, as above shown. This is rendered the more probable from other circumstances in the case. The captain of the John Jay was not steering for any single or definite point. There was no such custom-house barge-light at the battery as he testified to, but only the cluster of low lights, extending a quarter of a mile upon the water front. There are several higher lights further up the city; but it does not appear that he had any one of these in view. As the low lights of the battery were approached within three miles they would stretch over a considerable expanse. All that the captain aimed at

was, as he says, to keep these lights between the starboard forerigging and the foremast. His vessel was light, small, only 45 feet long over all, sailing in a stiff breeze, three points free, veered easily, and required constant minding of the helm; and the distance from the helm to the foremast was not great. That the captain was not very attentive is manifest from his not observing the lights of the Mayflower or Vesper, which had been in view for some time; and a similar inattention to his bearings would easily allow the schooner to luff, as she would naturally do, sufficiently to bring her red light momentarily into view; and without such luffing or a change of course he would not have reached the place of collision.

But had the red light been continuously hidden by the jib, as claimed, that would not improve the libellant's case. The Vesper can only be charged for some fault of her own. Her duty to keep out of the way of the schooner was conditioned upon her having notice of the situation and course of the John Jay by proper, visible lights. The rules of navigation require that these lights shall be "so constructed as to show a uniform and unbroken light over an arc of the horizon of 10 points of the compass, and so fixed as to throw the light from right ahead to two points abaft the beam," on either side. Rules 3 and 8, Rev. St. § 4233. If either light is so obscured that a steamer is mislead and deceived as to the course of the sailing-vessel, and a collision ensues in consequence, it is manifestly no fault of the steamer; and if the sailing-vessel suffer damage, it must be set down to her own fault or misfortune, as the case may be.

In the case of *Hoben* v. *The Westover*, 2 FED. REP. 91, to which I have been referred, the sailing-vessel was pitching and plunging in a tempestuous sea, producing fluctuations of her lights; and it was held the duty of the steamer observing this to have stopped in time to ascertain her course and avoid her. The point here is not merely the momentary changes of lights in a rough sea, but the continuous obscuration of one of them in comparatively smooth water, so as to mislead the steamer; and to this the case of *The Westover* has no application. In this case the captain of the Vesper, on seeing these fluctuations, which were but about a minute before the collision, blew two whistles, and almost immediately—in a few seconds, at least— rang four bells, to stop and reverse, and put his helm more to starboard to keep off still further. This was all he could do, so that even if the facts justified the theory of the libellant's counsel in regard to the obscuration of the red light by the jib, I should be obliged to hold the Vesper not in fault.

As the lights of the Vesper and Mayflower were certainly visible long before the collision, but were not seen, and as they must have been seen had the cook and deck hand been on the lookout, as they allege, it follows that little dependence can be placed upon any of their testimony; and reliance on the captain's testimony is also much weakened, not only by the errors and carelessness above shown, but by his positive testimony that he was steering for the custom-house barge-light at the battery, a light which has not been in existence for several years, while there was no single or definite light to supply its place.

As all the witnesses on the John Jay say that they saw no side lights of the Vesper, little weight can be given to their testimony as to the course and direction in which they supposed the Vesper was coming.

The want of any previous watch, and the captain's want of knowledge that he was approaching any steamer, put him probably in great confusion and alarm upon his sudden discovery of a steamer in close proximity, and prevented any cool or correct observation of her course, or any proper judgment of the need of change of course, by himself. Those on the Vesper had been long in constant watch of the John Jay; their navigation was correct, if their testimony is to be believed; their account of the collision is consistent and credible, and as it is confirmed by the captain of the Mayflower, who had full opportunities of observing, and who is in no way interested, I see no reason to discredit it, and I must, therefore, hold that the collision was without fault on the part of the Vesper, but was brought about primarily by the want of a proper lookout on the John Jay, and the want of steady and observant navigation, which led, upon the sudden and unexpected discovery of the Vesper, to a hurried and injudicious change of course, in consequence of which, solely, the collision occurred.

The libel should therefore be dismissed, with costs.

It would not be proper to confine the word "trial," as used in the third section of the act of 1875, to trials as understood at common law, because it applies to "any suit of a civil nature at law or in